**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND, *et al*.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 13 C 8649** |
| **TMG CORPORATION and GALLANT CONSTRUCTION COMPANY, INC.,** | ) ) ) | |
| **Defendants.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

The plaintiffs, which are pension and health and welfare funds (the Funds) related to the Chicago Regional Council of Carpenters (the Union), have sued TMG Corporation and Gallant Construction Company. TMG was a signatory to a contract with the Union called the Area Agreement. The Funds allege that TMG was a sham company that Gallant used to allow it to do work covered by the Area Agreement without paying appropriate fringe benefit contributions. The Funds contend that that the two defendants were in fact a single employer or that TMG was Gallant's alter ego. Both sides have moved for summary judgment. For the reasons stated below, the Court grants the Funds' motion in part and denies defendants' motion.

**Background**

The following facts are taken from the parties' summary judgment materials. Gallant and TMG were formed on the same day, TMG by Tom Galante and Gallant by

his brother Michael Galante. To avoid confusion, the Court will refer to each of the Galantes by his first name.

Tom and Michael each had the same registered agent and the same address in Maywood, Illinois, even though TMG had no office at that location. Tom was the sole shareholder, officer, and director of TMG, and Michael was the sole shareholder, officer, and director of Gallant until 1998, when Kevin Krak acquired half of the company. Krak acquired full ownership of Gallant in 2002 and is now Gallant's sole shareholder, officer, and director. Tom remained the sole shareholder, officer, and director of TMG until its dissolution in 2014, during the course of this litigation.

Both companies operated in the construction industry, performing remodeling services for their clients. Although there was no formal agreement between Gallant and TMG until 2007, the two companies worked together closely from their inception. In fact, Gallant was TMG's only customer throughout its entire existence, and the only payments for services that TMG ever received came from Gallant. Gallant, on the other hand, employed supervisors through its subcontract with TMG, through subcontracts with other entities, and through direct, independent contracts.

The plaintiffs are multi-employer trust funds that provide pension, welfare, training and other benefits to Union members and their families. Each trust fund is organized, administered, and governed according to an agreement, which sets out the terms of its services and fund distributions. Additionally, the Trust Funds are collectively administered according to the terms of a collective bargaining agreement known as the Area Agreement. The Area Agreement provides in relevant part that:

> EMPLOYER shall not contract or subcontract any work coming within the jurisdictional claims of the UNION or any person, firm or corporation not

2

covered by a Collective Bargaining Agreement with the UNION provided, however, that the provision of the paragraph shall apply only to the contracting and subcontracting of work to be done at the site of construction, alteration, painting or repair of a building, structure, or other work.

EMPLOYER, in recognition of the territorial and occupational jurisdiction of the UNION, shall not subcontract or contract out jobsite work coming within the jurisdiction of the Carpenters Union nor utilize on the jobsite the services of any other person, company, or concern to perform such work that does not observe the same wage, fringe benefits, hours, and conditions of employment as enjoyed by the Employees covered by this Agreement.

Area Agreement § 3.2-3.3, Pls.' Ex. A at Ex. 5.

TMG was a signatory to the Area Agreement. As a result, TMG was able to employ Union workers, but it gave up the right to subcontract with non-Union entities or employees for work covered by the Area Agreement.

Gallant, by contrast, was never a signatory to the Area Agreement. It used a non-Union work force as it wished and did not pay those workers the wages or fringe benefits required by the Area Agreement. But, through its relationship with TMG, Gallant was also able to obtain and use Union labor when it needed to do so.

The Funds contend that TMG and Gallant were a single employer or, in the alternative, that TMG was an alter ego of Gallant. They allege that Gallant and TMG's arrangement allowed Gallant to employ Union workers nominally employed by TMG while also employing non-Union workers without paying Union wages or fringe benefits and thereby operate outside the bounds of the Area Agreement. The Funds further allege that defendants did not produce records sufficient to allow the Funds' auditors to determine whether they had complied with their obligations under the Area Agreement. In this lawsuit, the Funds seek to hold Gallant liable under the Area Agreement. The Funds seek to recover unpaid fringe benefit contributions, interest, liquidated damages,

3

auditors' fees, and attorneys' fees and costs for the workers they hired to perform work within the scope of the Area Agreement.

Both sides have moved for summary judgment on the issue of liability. The Court will discuss the facts further in the body of this decision.

## Discussion

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court reviews the record and draws all reasonable inferences from it in the light most favorable to the non-moving party. *See Williamson v. Ind. Univ.*, 345 F.3d 459, 462 (7th Cir. 2003). Summary judgment is not appropriate if "the evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On cross-motions for summary judgment, the court considers each motion separately and views the evidence in the light most favorable to the party against whom the particular motion under consideration is made. *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561 (7th Cir. 2002).

Plaintiffs argue that TMG and Gallant were set up to appear that they were separate so that Gallant could operate outside of the bounds of the Area Agreement but that the two companies were, in fact, a single entity. They allege that Gallant breached the Agreement by contracting non-Union employees to perform work covered by the Agreement. On the other hand, TMG and Gallant continue to argue that they were truly separate entities that simply contracted with one another.

4

A.      **Single employer**

The Trust Funds argue that TMG and Gallant were, together, a single employer for purposes of the Area Agreement.  When two entities are sufficiently integrated such that they are essentially a single entity, they are treated as one for certain purposes. *Lippert Tile Co. v. Int'l Union of Bricklayer & Allied Craftsmen, Dist. Council of Wis. & Its Local 5*, 724 F.3d 939, 946 (7th Cir. 2013).  To determine whether two entities are a single employer, courts consider the totality of the circumstances, including whether (and to what degree) the companies had: 1) interrelation of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership.  *See, e.g., Chi. Reg'l Council of Carpenters Pension Fund v. Schal Bovis, Inc.*, 826 F.3d 397, Nos. 14—3413 & 14—3336, 2016 WL 3262532, at *4 (7th Cir. June 10, 2016).  In general terms, single employer status is characterized by the "absence of an arm's length relationship found among unintegrated companies."  *Lippert Tile Co.*, 724 F.3d at 947.

1.      **Interrelation of operations**

The Trust Funds point to shared decision-making apparatuses and financial structures as evidence of the interrelatedness of TMG and Gallant.  Courts have held that "day-to-day operational matters" are most relevant when considering the question of interrelatedness of the operations. *Lippert Tile Co.*, 724 F.3d at 947.  Specifically, courts have considered, among other factors, whether purportedly separate businesses shared the maintenance of their business records, processed payroll jointly, processed their billing and bank accounts together, and shared space.  *See id.*

No reasonable fact finder could find that the two companies conducted their day-

5

to-day operations separately.  To the contrary, the undisputed evidence demonstrates that TMG and Gallant integrated nearly all aspects of their day-to-day operations.  The two companies shared the same attorney for filing their annual reports; they shared the same registered agent; they maintained bank accounts at the same time at the same banks; and they used the same insurance broker.  Gallant provided the superintendents who were paid through TMG with laptops, cell phones, and credit cards, at Gallant's expense.  TMG never had a permanent, stand-alone office; instead, it opted to operate primarily out of Gallant's construction offices.  TMG's mail delivery also significantly overlapped with that of Gallant—TMG had some of its mail sent to Gallant's headquarters and addressed to the attention of Gallant employees, and Gallant collected additional TMG mail from TMG's post office box.

Defendants argue that the companies shared space not because they were one employer, but rather because TMG did not require a brick-and-mortar headquarters given the nature of its business.  They argue that because TMG focused on subcontracting, it was more efficient for it to be housed in the same space as its client. Defendants also point out that although TMG and Gallant both held bank accounts at Fifth Third and American Community Bank & Trust during the same periods, they did not have common account signatories.  But no reasonable fact finder could find that distinction significant in this case.  Gallant controlled a signature stamp for Tom Galante, TMG's sole director—who was, presumably, the signatory on TMG's bank account.  When one company controls the ability of another to issue checks, that is an intertwined relationship, not an arm's length relationship.  Perhaps if the signature stamp were the sole piece of evidence cited by the Funds as tending to show

6

interrelation of the two companies' operations, a reasonable fact finder might be able to disregard it. But given the totality of the circumstances—the signature stamp, along with the shared space, mail collection, registration information, hiring practices, and payroll accounts, as notable examples—no reasonable fact finder could find that the company's operations were not interrelated.

### 2. Common management

The second step of the single-employer test requires a court to determine whether and to what degree two entities share common management. *See Lippert Tile Co.*, 724 F.3d at 947. This inquiry involves the degree of actual or active control, not formal job titles or potential control over day to day operations. *See id.* (citing *Cimato Bros., Inc. and Cimato Bros. Constr., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 17*, 352 NLRB 797, 799 (2008)).

The Funds do not contend that the two companies shared any official or formal management. Instead, they argue that Gallant had actual control over TMG. In particular, the Funds argue that Gallant's primary decision-makers—controller Stacey Rice and president Kevin Krak—were also the *de facto* decision-makers for TMG and had unfettered access to certain aspects of TMG's business. As described below, Krak and Rice both wielded considerable control over TMG's hiring and accounting processes.

First, the Funds have demonstrated—and the defendants do not dispute—that Krak had a significant role in the hiring of TMG employees. In particular, TMG superintendent Jim Benes testified that Krak interviewed him for his position. Benes further testified that Tom Galante never acted as his boss. Instead, he understood Krak

7

to be his boss. Another TMG employee named Prokuski testified that he had a similar understanding. Tom Galante stated in his affidavit that he was the sole individual with unilateral and ultimate authority to hire and fire superintendents employed by TMG, but no reasonable fact finder could interpret this evidence as reflecting anything more than his formal job title and potential control, considerations that are insignificant in this inquiry. No reasonable fact finder could find that that Krak had anything other than considerable control over the day-to-day operations of both Gallant and TMG.

Krak also had access to Tom Galante's signature stamp for over a decade, and he used it frequently. Krak testified that he frequently endorsed paychecks from TMG's bank account with Tom's signature using the signature stamp. Krak also testified that he did the same with TMG's fringe benefit contribution reports. Defendants attempt to downplay this; they note that the signature stamp "was equally and alternatively in the possession of Tom Galante and Kevin Krak" during the relevant time. Defs.' Resp. at 9. But they do not dispute that Krak had and used the signature stamp. No reasonable fact finder could determine that Krak lacked control over TMG;s affairs.

Krak's control over TMG's affairs, though apparent, pales in comparison to that which Rice exercised. The undisputed testimony reveals that Rice effectively steered the ship when it came to TMG's finances and paperwork. She was in regular contact with accounting firm Brown and Company. In particular, she worked closely with Brown and Company employee Mary Bowman, who handled the management of TMG's finances and cut its checks through the firm. Tom testified that rarely spoke with Bowman and never met her. When he did speak to Bowman, it generally concerned his own finances, not his employees' payroll or other business related to TMG. By contrast,

Rice directed Bowman to pay TMG invoices, cancel payroll services, and issue bills or refunds to Gallant.  Rice also reviewed and approved TMG's annual financial statement, which Bowman would use to prepare TMG's annual tax return.  Rice was also the primary contact for TMG's bank, American Community Bank and Trust.  Tom testified that he had no contact with American Community Bank & Trust—one of TMG's banks— and that he had never seen a statement from the account.

Defendants dispute the inference to be drawn from these facts, but they do not contest the underlying facts.  They do not dispute that Gallant controller Rice and Gallant president Krak each had a considerable amount of control over certain major aspects of TMG's business operations—arguably as much as, if not more than, TMG's only officer.  This degree of actual control is what matters when considering whether two companies shared common management.  For this reason, even though TMG and Gallant had no officers in common, no reasonable fact finder could find that they did not share common management.

### 3.    Centralized control over labor relations

Gallant president Krak's involvement in the hiring and management of TMG employees also tends to suggest that the two entities' labor relations were handled in common.   In assessing this factor, courts consider, among other things, the person or entity who was responsible for day-to-day labor decisions like setting wages, hiring, and firing. *Lippert Tile Co.*, 724 F.3d at 947.  The Court has already detailed Krak's involvement in the hiring and management of TMG employees.

The Funds have, however, presented additional evidence.  Defendants do not dispute that when TMG stopped operating, many of the superintendents who had been

paid through TMG were then paid by Gallant.  *See* Defs.' Resp. to Pls.' Stat. of Facts ¶ 72 (listing the names of nine TMG employees who went to work for Gallant after TMG dissolved).  Based on the undisputed facts, it would appear that the sole difference between the superintendents' employment at TMG and their employment at Gallant was the name of the entity that appeared on their paychecks.  The nature of their work did not change, and they retained the equipment that had been distributed to them through Gallant (purportedly on behalf of TMG).

TMG takes issue with the Funds' framing of the companies' relationship as an "arrangement," but this is an argument about terminology, not a dispute regarding the relevant facts.  Defendants also argue that TMG's employees were not simply transferred to Gallant but instead were laid off from TMG and were able to interview and obtain positions at Gallant.  But defendants offer no argument regarding why this sort of transition—assuming this is what actually took place—would undermine the proposition that Gallant absorbed TMG's employees.

Employees Benes and Prokuski both testified, in substance, that TMG and Gallant were inextricably linked, intimating that they were two wings of the same company.  Benes testified that he originally learned of the available position at TMG through an employee of Gallant; he submitted his resume to an employee of Gallant; he interviewed at the office of Gallant Construction and he received notice from a Gallant employee that he had been hired by TMG.  Benes reported directly to project managers who were employed by Gallant, and as noted earlier, he considered Krak, Gallant's president, to be his boss.  Prokuski testified in a similar fashion.

Defendants do not meaningfully dispute Benes' or Prokuski's testimony;.

10

Instead, they offer additional information that they contend affects the inference reasonably drawn from the testimony. Tom Galante testified that he interviewed both employees Benes and Prokuski, although he did not dispute that Krak met with them as well. Regarding Prokuski, Tom said that he "would not describe [the Krak meeting] as an interview, only meeting TMG's client, with whom [he] knew Prokuski would be working." Defs.' Resp. to Pls.' Stat. of Facts ¶ 61. The difference is semantic. The nuanced difference between Tom's characterization and that offered by the Funds is of little importance when evaluating the overall relationship between Gallant and TMG. No reasonable fact finder could determine from the evidence that the two companies had an arm's length relationship or anything close to it. Rather, the only conclusion a reasonable fact finder could make, even viewing the evidence in the light most favorable to the defendants, is that the companies were under common control—especially with regard to TMG's labor relations.

### 4.  Common ownership

Although the companies never shared an owner in so many words, the Funds contend that they effectively had common ownership given the relationship between the two brothers. The Court notes that the cases the Funds cite in support of this argument do not hold up under close scrutiny. In particular, plaintiffs cite cases for the proposition that ownership of two companies by members of the same family is evidence of common ownership. The primary case they cite for that proposition, *Cent. Ill. Carpenters Health & Welfare Trust Fund v. Struben*, No. 05-1094, 2009 WL 497393, at *21 (C.D. Ill. Feb 24, 2009), notes that "the fact that two companies are owned and controlled by members of the same family may be considered as evidence of common

ownership," but "that factor alone cannot be enough." But in support of that conclusion, *Struben* cites *Trustees of Pension, Welfare and Vacation Fringe Ben. Funds v. Favia*, 995 F.2d 785, 787 (7th Cir. 1993), and *Cent. States, Southeast and Southwest Areas Pension Fund v. Sloan,* 902 F.2d 593 (7th Cir. 1990)—neither of which say this. *Favia* does not discuss the familial relationship between the two business owners in addressing the common ownership element. *See Favia*, 995 F.2d at 788. And *Sloan* was an alter ego case. *See Sloan*, 902 F.2d at 596. Although the two types of claims overlap to some degree, they are not the same: Courts have deemphasized the importance of common ownership as it relates to alter ego claims.. *Favia*, 995 F.2d at 789 ("[A]n alter ego relationship has been found to exist even though no evidence of actual common ownership was present. Thus [a] rejection of the single employer doctrine d[oes] not preclude the application of the alter ego doctrine."). So although *Struben* provides some support for the Funds' contentions, it is not terribly persuasive on this point.

In sum, absent any evidence of common ownership, the Court concludes that this factor weighs against a finding that the two companies were a single employer.

### 5. Conclusion

As in *Lippert Tile Co.*, the factors relevant in assessing the Funds' single employer argument do not all point the same way. In that case, the Seventh Circuit noted that the two companies at issue did not share the exact same space and employed different corporate officers. *Lippert Tile Co.*, 724 F.3d at 947. Even so, "on balance," the Seventh Circuit found "the operations to be extensively interrelated if not intertwined." *Id.* The Seventh Circuit relied on this finding of interrelatedness to affirm

12

the district court's grant of summary judgment for the funds in that case, quoting the district court in finding that "for all practical purposes, the companies function[ed] as a single entity." *Id.* at 948 (*citing Lippert Tile Co. Inc. v. Int'l Union of Bricklayer & Allied Craftsmen Dist. Council of Wis. Local 5*, 868 F. Supp. 2d 823, 828 (E.D. Wis. 2012)).  In short, the totality of the circumstances supported a finding that the companies in *Lippert* were a single employer.

The same is true here.  In considering the various factors relevant to the single employer analysis, it is the totality of the circumstances that matter, not the individual elements considered on their own.  *See Favia*, 995 F.3d at 788.  Here the only factor that arguably tilts against a single employer finding is the absence of common ownership.  But "a single employer finding does not require every factor to be met." *Chi. Reg'l Council of Carpenters Pension Fund v. McGreal Constr., Inc.*, 2012 WL 5921140, at *3 (N.D. Ill. Nov. 26, 2012) (citing *Esmark, Inc. v. NLRB*, 887 F.2d 739, 753 (7th Cir. 1989).  No reasonable fact finder considering all the evidence could find that the companies operated at arm's length and that they were anything other than an integrated entity operated in common.  To put it another way, given the degree of interrelatedness of the companies' operations, management, and labor relations, any reasonable fact finder would be required to find that the companies were intertwined and were, in effect, one entity.  For these reasons, the Funds are entitled to summary judgment on their single employer claim.

## B. Alter ego

As an alternative basis for liability, the Funds contend that TMG was an alter ego of Gallant and, for that reason, is bound by the Area Agreement that Gallant executed.

13

To establish that one company is an alter ego of another, a plaintiff must demonstrate "the existence of a disguised continuance of a former business entity or [an] attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets." *Favia*, 995 F.2d at 787. "When attempting to discern whether a new company is another's alter ego, courts (or, at trial, finders of fact) engage in an fact intensive analysis, examining factors like whether the two companies have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Trs. of Chi. Painters and Decorators Pension Fund v. John Kny Painting & Decorating, Inc.*, No. 14 C 6507, 2016 WL 406328, at *3 (N.D. Ill, Feb. 3. 2016) (Kennelly, J.). But the alter ego analysis differs from the single employer doctrine in that "unlawful motive or intent is the most critical factor for finding alter ego status in the Seventh Circuit." *Id.* (noting that motive or intent is not the keystone in some other circuits). Having addressed the first part of the alter ego test in its single employer discussion, the Court now turns to the issue of motive and intent.

TMG was not a "disguised continuance of a former business entity," because it existed at the same time as Gallant. But the alternative means of establishing an alter ego claim—"an attempt to avoid the obligations of a collective bargaining agreement, such as though a sham transfer of assets"—fits the Funds' contentions. They allege that the Galante brothers set up the companies so that they could have one "union" version and one "non-union" version and thereby play both sides of the street.

The parties hotly dispute the motive issue. Defendants contend that their motive for forming two separate companies was innocent and entirely unrelated to any contemplation of Union contributions. The Funds argue that the Galante brothers

14

formed the two companies with the goal of avoiding Union contributions in mind. They point to the circumstances surrounding the companies' formation—the shared registration details and the fact that TMG immediately signed the Area Agreement but Gallant refrained from doing so. The Funds also point to testimony from employees regarding the companies' relationship. The Funds also highlight the undisputed fact that there was no profit made on the business done between the two companies—indeed, the defendants themselves note that "the subcontract for TMG stated that Gallant would bear all expenses for TMG and that TMG did not make a profit but was instead reimbursed for its payroll." Defs.' Resp. to Pls.' Stat. of Facts ¶14; *See* Galante Dep., Defs.' Ex. 2, 184:17-185:1 (testifying that "there's no profit component" built into "the arrangement with TMG").

The Funds ask the Court to draw an inference that TMG was a sham company from TMG's admission that its relationship with Gallant was designed without profit in mind. There is also other evidence supporting the Funds' claim—in particular, Prokuski's testimony that TMG was "the union version of Gallant." But defendants dispute the significance of Prokuski's statement, arguing that he lacked the requisite knowledge to opine on whether TMG was, in fact, "the union version of Gallant." See Defs.' Resp. to Pls.' Stat. of Facts ¶ 61.

On the other hand, the defendants insist that the companies were set up for independent reasons. They dispute the Trust Funds' claim that TMG was formed as a "pass through entity that would pass through all of its expenses to Gallante." *Id.* ¶ 14. They point to Tom Galante's testimony that he launched his own company so that he could work with his brother rather than for his brother. See Defs.' Ex. 2, 58:10-18.

The Court concludes that there is a genuine dispute on the issue of motive. Because that factor is a key aspect of the alter ego analysis, this dispute precludes summary judgment for either party on the alter ego theory.

## Conclusion

For the foregoing reasons, the Court grants plaintiffs' motion for summary judgment [dkt. no. 97] in part, specifically on the issue of liability on their single employer theory. The Court denies plaintiff's motion for summary judgment on the issue of liability on their alter ego theory. The Court denies defendants' motion summary judgment [dkt. nos. 109]. The case is set for a status hearing on September 6, 2016 at 9:30 a.m. The Court does not know whether, in light of its entry of summary judgment as to liability in the Funds' favor on their common employer claim, further litigation of the alter ego claim is necessary or appropriate. Counsel are to consider that issue and are to be prepared to address it at the status hearing, along with the nature of any other proceedings needed to bring the case to conclusion.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 29, 2016

16